**FORM 1**

## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

Thomas Carroll

v.                                    CIVIL CASE NO. 3:02CV790(PCD)

Kristine Ragaglia, et al.

### NOTICE OF APPEAL

1. Pursuant to F. R. A. P. 4(a)(1), __Thomas Carroll__ hereby gives notice and
                                    (appealing party)
appeals to the United States Court of Appeals for the Second Circuit from the following

Judgment or Order (attach the Judgment or Order):
Order entering summary judgment for the defendants

_____

_____

2. The Judgment /Order in this action was entered on __November 14, 2003__ .
                                                        (date)

_____
Signature

James A. Wade
Print Name

Robinson & Cole LLP

280 Trumbull St.    Hartford, CT 06103-3597
                    Address

Date: 12|8|03

(860) 275-8270
Telephone Number

**Note: You may use this form to take an appeal provided that it is received by the Office of the Clerk of the U.S. District Court within 30 days of the date on which the judgment was entered (60 days if the United States or an officer or agency of the United States is a party).**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

THOMAS J. CARROLL

v.                                                    Civil No.  3:02 CV 790 (PCD)

KRISTINE D. RAGAGLIA, INDIVIDUALLY AND
AS COMMISSIONER OF THE CONNECTICUT
DEPARTMENT OF CHILDREN AND FAMILIES;
JUDITH FRITZ, INDIVIDUALLY AND AS A SOCIAL
WORKER OF THE CONNECTICUT DEPARTMENT
OF CHILDREN AND FAMILIES; LAURA CURRAN,
INDIVIDUALLY AND AS AN INVESTIGATOR FOR
THE CONNECTICUT DEPARTMENT OF
CHILDREN AND FAMILIES; DAWN DOTY,
INDIVIDUALLY AND AS A FORMER SOCIAL
WORKER OF THE CONNECTICUT DEPARTMENT OF
CHILDREN AND FAMILIES

## JUDGMENT

This matter came on for consideration on the defendants' motion for summary judgment

before the Honorable Peter C. Dorsey, Chief United States District Judge.

The Court has reviewed all of the papers filed in conjunction with the motion and on

November 12, 2003, entered a Ruling on Motion for Summary Judgment granting the relief.

It is therefore ORDERED and ADJUDGED that  summary judgment is entered for the

defendants and the case is closed.

Dated at New Haven, Connecticut, this 14th day of November, 2003.

KEVIN F.  ROWE, CLERK
By


Patricia A. Villano
Deputy Clerk


EOD: _____

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT    FILED

Nov 12  10 18 AM '03

U S DISTRICT COURT
NEW HAVEN, CONN.

THOMAS J. CARROLL,              :
     Plaintiff,             :

      -vs-                 : Civ. No.3:02cv790 (PCD)

                        :

KRISTINE D. RAGAGLIA, et. al.,   :
     Defendants.          :

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Kristine D. Ragaglia, Judith Fritz, and Laura Curran move for summary

judgment on all counts.[1] For the reasons stated herein, Defendants' motion is **granted**.

**I.**    **Background**[2]

In July, 1998, the child John Doe[3], a special needs child with behavior problems, was

removed from his birth mother's care and was placed by DCF as a foster child in with Plaintiff,

who was his primary caregiver.

From August, 1997 through March, 2003, Ragaglia was Commissioner of the Department

of Children and Families (DCF). Plaintiff attended informational meetings in 1999 at which

Ragaglia was a speaker, and telephoned Ragaglia to complain about the DCF New Britain office

and its poor handling of the child.[4]

---

[1]   Although Plaintiff named Dawn Doty (former DCF social worker) as a Defendant, she has not
been served and has not appeared. Accordingly, all claims against her are **dismissed.**

[2]   Facts are taken from the parties' Local Rule 56(a) statements, and are undisputed unless stated
otherwise.

[3]   Pursuant to the Court's endorsement granting the parties joint motion for confidentiality, the child
is referred to as "John Doe" or "the child." *See* Doc. No. 23.

[4]   Plaintiff provides no details regarding when calls were made, to whom he spoke, etc.

In 2000, Curran was employed as an investigative social worker, assigned to investigate reports of suspected child abuse or neglect reported to the DCF hotline. Curran's first contact with Plaintiff was on October 10, 2000. Fritz, a treatment social worker, was assigned to the child's case in May, 2000. Foster and Adoption Services Unit (FASU), a different DCF unit than Fritz's unit, was responsible for foster parent training, licensing, and for primary support of assigned foster homes. Curran and Fritz were trained by DCF, as were Plaintiff and his wife. Plaintiff alleges that such training was inadequate, and did not include training on Reaction Attachment Disorder ("RAD"). Plaintiff self-studied RAD.

After assignment to the child's case, Fritz learned of the child's diagnosis of RAD. Plaintiff contends Fritz did not understand RAD and was not interested in learning about it. Defendants contend that she consulted various resources to familiarize herself with the condition. Fritz attempted to alleviate stress within the foster home, including respite care at various times. As of August, 2000, Plaintiff had no complaint against Fritz.

Plaintiff's wife complained to the Office of the Child Advocate ("OCA"), an independent state agency which investigates complaints concerning actions of state agencies providing services to children, regarding DCF's handling of the child's case. She left messages with an unidentified OCA secretary, but no one spoke with her directly. An Assistant Child Advocate wrote to Plaintiff's wife on September 19, 2000, stating that DCF's narrative case reports had been reviewed and that DCF's actions were found appropriate to the child's needs.

On October 10, 2000, DCF received a report on its hotline of suspected child abuse concerning the child. The school social worker at his elementary school reported that she and the school nurse observed marks on the child's neck and arm. Although initially the child told her that he did not recall how he got the marks, he later stated that he had a conflict with his foster

2

father (Plaintiff) about cleaning his room the previous evening. The child stated that Plaintiff grabbed his neck and arm and possibly placed his hands on the child's face. The social worker noted that the child had a mark on his neck approximately three inches by one inch, which had broken blood vessels, was reddish-brown in color, and resembled a rope burn. The report indicated that there were marks under the child's eyes, and that he was a special education student diagnosed with attention deficit disorder and was on medication.

On October 10, 2000, Curran was assigned to investigate the report of abuse. The school social worker told Curran that she brought the child to the school nurse after observing red marks on his neck. Curran learned that the school nurse had called Plaintiff earlier that day and Plaintiff told her that he had not noticed any marks on the child but that it had been a "rough weekend." The foster parents reported to the school that the child had difficult behavior problems at home. Curran called Fritz, the treatment social worker, seeking additional background information, and was told that the child is difficult to manage and has attachment disorder and a tendency to fabricate. Fritz also told Curran of a report by Plaintiff that the child falsely stated that Plaintiff had hit him in a grocery store. Fritz advised Curran that Plaintiff and his wife were dissatisfied with DCF's handling of the case.

On October 10, 2000, Curran visited the child's elementary school and interviewed the child alone in the school social worker's office. She noticed bruises and marks on the child. The child told Curran that Plaintiff had applied physical force to him during an argument the previous evening over cleaning the child's room.

This same day Curran visited Plaintiff's home and informed Plaintiff of the concern regarding the physical marks on the child's face and neck. Plaintiff became frustrated about the situation. Defendants allege that Plaintiff attempted to call the child's therapist, Marguerite

3

Ruppenicker. Plaintiff alleges that Ruppenicker called Plaintiff during Curran's visit. Plaintiff

alleges that Curran refused to speak with Ruppenicker, and that Curran requested Plaintiff to stay

off the phone so Curran and Plaintiff could discuss the situation. Plaintiff told Curran that the

child had a temper tantrum the previous evening and was flailing around, and that the next

morning he had to physically put the child in the shower because the child refused to clean

himself. Plaintiff advised that the child had a cut on his foot and that Plaintiff put alcohol on the

wound. Plaintiff kept repeating that he knew that this was going to happen, because of the

child's tendency to lie and accuse people of hurting him when he does not get his way.[5]

Later this day Fritz arrived at Plaintiff's home and was present when the child returned

from school. According to Plaintiff, the child arrived home and ran to Curran to show her more

marks, which Curran identified as old marks. According to Defendants, Plaintiff immediately

told the child to come to him so he could observe the child's neck. When Plaintiff asked the

child what happened, the child indicated that Plaintiff had pulled on his neck the previous night.

---

[5]     Plaintiff and Defendants dispute the facts of the October 9, 2001 altercation between Plaintiff and
the child. In their Local Rule 56(a) statement, Defendants indicate that the child told Curran that
[Plaintiff] grabbed [the child] by his neck and dragged him to his bedroom. He stated that
[Plaintiff] choked him with his hands and also by pulling up on the back of his shirt . . .
[and that Plaintiff] put his hands over [the child's] mouth to stop him from yelling. [The
child] also reported that [Plaintiff] held him face down on the ground. [The child]
reported that he could not breathe and his head started to hurt. . . . [The child] said he did
not know how he got the marks under his eyes, on his cheek or his arm, but he thought
they happened the evening of October 9th.
Def. Local Rule 56(a) Statement ¶ 18.
Plaintiff offers a different account of events, indicating that he had told Curran
that he had to take off [the child's] clothes and put him in pajamas because [the child]
refused to do it himself. During that time, [the child] was having a serious temper tantrum
and was flailing himself around and kicking things. [He] also explained that the next
morning he had to physically put [the child] in the shower because he would not clean
himself.
Pl. Local Rule 56(a) Statement ¶ 21. Defendants allege that during his conversation with Curran
Plaintiff indicated that the child put his pajamas on after initially refusing, and went to bed;
Plaintiff denied causing any marks on the child's neck and did not know how the child got the
marks. Def. Local Rule 56(a) Statement ¶ 21.

4

Defendants allege that Plaintiff and the child accused each other of lying and that Plaintiff directed the child to go to his room.

This same day, the police were contacted about the incident,[6] and State Trooper Derek Allen, who had previously investigated a complaint that Plaintiff's wife struck the child with a wooden spoon in February of 2000, arrived at Plaintiff's home and interviewed the child in Curran's presence. Defendants allege that the child told Allen "substantially the same account" of the incident, and Plaintiff alleges that the child's story was different from the one told to Curran or the school nurse. Allen also interviewed Plaintiff alone in the squad car.

Later in the day Fritz took the child to an emergency room for examination. The emergency room physician called the DCF hotline to report suspected abuse, and the emergency room report reflected that the child had a bump on his head, bruising, petechiae[7] on his neck and under his eyes (indicative of choking), and finger marks on his right cheek and left forearm. Two physicians examined the child and diagnosed physical abuse. Plaintiff alleges that the emergency room physicians were not told about the child's diagnosis of RAD or his history of making false allegations of child abuse.

On October 12, 2000, Ruppenicker told Curran that she suspected the child had RAD, and that he accuses his foster parents of abuse when he does not get what he wants. Ruppenicker did not have any concerns about abuse or inappropriate discipline in Plaintiff's home, but she was aware that Plaintiff's wife once hit the child with a wooden spoon. Ruppenicker opined that

---

[6] Defendants allege that Linda Madigan Runlett, Curran's supervisor, contacted the police. Plaintiff alleges that Curran called the police.

[7] Petechiae is "a small red or purple spot in the skin caused by extravasation [escape] of blood." Oxford English Dictionary.

5

DCF did not sufficiently train Plaintiff and his wife. Plaintiff alleges that Ruppenicker also told Curran that the child could injure himself during tantrums.

This same day Curran was informed by the child's pediatric group that a chart dated January 28, 1999 stated that the foster parents were concerned about the child's lying and aggressiveness. The chart did not indicate any neglect or abuse. Curran also called the school nurse.

Pursuant to DCF policy, at the conclusion of an investigation the investigator is required to consult with her supervisor to determine whether the report of abuse or neglect is substantiated or unsubstantiated. Defendants allege that physical abuse was found to be substantiated on or about October 16, 2000. Plaintiff alleges that the decision to substantiate was made the same day abuse was reported.

During the course of these events, Plaintiff repeatedly noted the child's history of lying. While Curran was aware that the child had exaggerated or lied, DCF records demonstrate that the child accurately reported to DCF at least two specific incidents. One incident involved Plaintiff's wife striking the child with a wooden spoon because he was throwing snowballs at horses.[8] Plaintiff's wife was criminally charged by state police as a result. The other incident involved Plaintiff's wife putting soap in the child's mouth, to which she admitted.

As an investigative social worker, Curran was not involved in the provision of services or support to Plaintiff's foster home or treatment services to the child. Neither Curran nor Fritz were involved in scheduling the administrative hearing.

---

[8] A neighbor had reported that Plaintiff's wife hit the child with an object that appeared to be a wooden spoon. Defendants allege that she "struck" the child on his hand with the spoon, while Plaintiff alleges that she "tapped" his hand.

6

On or about October 10, 2000, Plaintiff retained attorney James A. Wade to represent him. At the end of October, 2000, Wade met with the prosecutor on Plaintiff's behalf and advised the prosecutor of the child's RAD diagnosis and his propensity to lie. Wade encouraged the prosecutor to speak with the child's therapist, psychiatrist, attorney and former attorney, the Connecticut Association of Foster and Adoptive Parents, Inc., and school teacher.

On or about October 17, 2000, DCF notified Plaintiff that he had been substantiated as an abuser. Plaintiff demanded an appeal of the substantiation. On or about October 26, 2000, DCF provided "Notification of Investigation Review Results" which stated that the substantiation was upheld. Plaintiff's attorney's requested an administrative hearing to challenge the determination. A paralegal in DCF's Administrative Hearings Unit sent Wade a letter scheduling an administrative hearing on January 22, 2001, to be held in accordance with the Uniform Administrative Procedures Act, CONN. GEN. STAT. §§ 4-177 through 4-181, and DCF Policy §§ 22-12-1 through 22-12-8. After the hearing began, Plaintiff learned that State Trooper Derek Allen had left his photographs of the child's bruises at the office. Plaintiff's request for a continuance was granted, and the hearing was continued to February 23, 2001.

On or about January 29, 2001, Plaintiff was arrested in connection with the October 9, 2001 incident and charged with assault in the third degree and risk of injury to a minor. After learning of the arrest, the hearing officer notified Plaintiff's attorney that the upcoming hearing would be deferred pending disposition of criminal court proceedings related to the alleged abuse being reviewed in the administrative proceeding. The letter stated that "[u]pon resolution of the court proceeding, you may request to reactivate your hearing request by sending a letter, and any necessary documentation relative to the adjudication of the [criminal] charges" to the Director of the Division of Administrative Law and Policy ("the Director of ALP"). Attorney Wade

7

protested the hearing officer's decision, and wrote that "[t]he Department's conduct is an example of arbitrary and capricious administrative action without statutory or regulatory authority." In response, the Director of ALP wrote Wade stating that "your objection to the decision is noted and it is made a part of the record."

On September 12, 2001 the criminal charges were dismissed. In arguing for dismissal, Wade represented that "[o]ne of the reasons we're asking for a dismissal is that under the State's system there is an administrative proceeding that is on-going [and that] involves [Plaintiff's] name being listed [on the child abuse registry]. . . and we intend to take such steps as necessary to have that erased as well." Plaintiff neither commenced a Superior Court action for that purpose nor sought a continuation of the hearing, but instead filed this suit.

Count One of Plaintiff's complaint alleges Defendants intentionally inflicted emotional distress and were "wanton, reckless, and malicious" in that (1) Plaintiff was substantiated as a child abuser without a hearing and without due process; (2) DCF's policies and procedures regarding the investigation of the October 9, 2000 incident violated Plaintiff's rights guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, §§ 7, 8, and 9 of the Connecticut Constitution; (3) DCF and Defendants failed to keep adequate records; (4) DCF and Defendants did not provide adequate support to Plaintiff; (5) DCF and Defendants put Plaintiff's name on a child abuse registry without due process of the law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, §§ 7, 8, and 9 of the Connecticut Constitution; (6) DCF and Defendants referred the matter to the Connecticut State Police and consequently Plaintiff was arrested and charged with criminal conduct; (7) DCF and Defendants discriminated against Plaintiff despite his good record and the child's tendency to lie; (8) Defendants acted in excess of their statutory authority as DCF officials; and (9) the

8

accusations made by DCF and Defendants that Plaintiff was a perpetrator of child abuse are libelous and made without due process of law.

Count Two alleges that Defendants' actions constituted an abuse of process and vexatious litigation.

Count Three alleges that Defendants' actions violated Plaintiff's rights under 42 U.S.C. § 1983 in that (1) they violated Plaintiff's Fourteenth Amendment right to procedural due process; (2) Defendants' behavior shocks the conscience; (3) they interfere with Plaintiff's ability to pursue a career in child care in violation of his Fourteenth Amendment right to due process; (4) they violated his Fourth Amendment right to be free from unreasonable searches and seizures.

Count Four alleges that Defendant's actions violated Plaintiff's rights under Article I §§ 7, 8, and 9 of the Connecticut Constitution for the same reasons cited in support of Count Three.

Count Five alleges that Plaintiff was slandered, libeled, and defamed by Defendants.

Plaintiff seeks money damages, punitive and exemplary damages, court and administrative costs and attorneys' fees, a mandatory injunction ordering Defendants to expunge all DCF records relating to the October 9, 2000 incident, and a jury trial.

## II.      Standard

A party moving for summary judgment must establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56 (c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'" *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). In determining whether a genuine issue has

9

been raised, all ambiguities are resolved and all reasonable inferences are drawn against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). Summary judgment is proper when reasonable minds could not differ as to the import of evidence. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). "Conclusory allegations will not suffice to create a genuine issue." *Delaware & H. R. Co. v. Conrail*, 902 F.2d 174, 178 (2d Cir. 1990). Determinations as to the weight to accord evidence or credibility assessments of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

**III.    Discussion**

    **A.    Absolute Immunity**

        Defendants argue that to any extent Plaintiff contends that Defendant Curran is liable for determining that Plaintiff perpetrated physical abuse, she is protected by absolute immunity. Def. Mem. in Supp. of Summ. J. at 26. Plaintiff argues that Defendants are not entitled to absolute immunity as they did not act as a prosecutors or judicial officers. Pl. Opp. at 20.

        Judges and prosecutors are cloaked with absolutely immune from liability for damages based on actions taken in furtherance of their judicial or prosecutorial duties. However, "'immunity is justified and defined by the functions it protects and serves, not by the persons to whom it attaches.'" *Gyadu v. Workers' Comp. Comm'n.*, 930 F. Supp. 738, 748 (D. Conn. 1996) (citing *Forrester v. White*, 484 U.S. 219, 227, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1988)). "Accordingly, absolute immunity protects officials from liability for actions which are functionally comparable to those of judges and prosecutors." *Moran v. Connecticut Dep't. of Pub. Health & Addition Servs.*, 954 F. Supp. 484, 489 (D. Conn. 1997). "Because qualified

10

immunity is presumed to be sufficient to protect public officials in the exercise of their discretionary duties, *see Burns v. Reed*, 500 U.S. 478, 486-87, 114 L. Ed. 2d 547, 111 S. Ct. 1934 (1991), absolute immunity extends only so far as necessary to protect the judicial process." *Hill v. City of New York*, 45 F.3d 653, 660 (2d Cir. 1995).

"The investigation of charges of child abuse and the removal of a child from its parents' custody is accorded only qualified protection." *Hill*, 45 F.3d at 661 (citing *Robison v. Via*, 821 F.2d 913, 918-20 (2d Cir. 1987)). "[A]dvising the police during the investigative stage of a case that they have probable cause to arrest [is] an advocacy function." *Id.* (citing *Burns*, 500 U.S. at 493). Accordingly, Defendants are not entitled to absolute immunity for actions in the investigative phase, including communications which may have contributed to the police finding probable cause to arrest Plaintiff.

**B.      Section 1983 Claims (Count Three)[9]**

Count Three alleges that Defendants deprived Plaintiff of his rights under 42 U.S.C. § 1983 in that Defendants' actions (1) violated his Fourteenth Amendment right to procedural due process; (2) "constituted a gross abuse of power that is shocking to the conscience;" (3) impeded and continue to impede his ability to pursue a career in child career pursuant to the Fourteenth Amendment; and (4) violated his Fourth Amendment right to be free from unreasonable searches and seizures. Defendants argue that they are entitled to summary judgment on Count Three because (1) they had no personal involvement in these actions, and (2) they are cloaked with qualified immunity because Curran and Fritz's actions were objectively reasonable, and because

---

[9]      Because "a violation of state law is not cognizable under § 1983," *Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985), the federal law doctrine of qualified immunity does not apply to state law claims, and accordingly the qualified immunity defense is construed as a defense against Count Three of Plaintiff's complaint.

11

there was no violation of a clearly established constitutional right. Plaintiff responds that

Defendants were personally involved and that the constitutional rights violated by Defendants

were sufficiently clear to preclude summary judgment.

### 1.    Personal Involvement of Defendants

"It is well settled in this Circuit that personal involvement of defendants in alleged

constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v.*

*Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quotation and citations omitted).  A defendant cannot be

held personally responsible merely because of his or her high position of authority. *See id.*

Supervisor liability in a § 1983 action depends on a showing of some personal involvement, and

cannot rest on *respondeat superior*. *See Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065

(2d Cir. 1989).  Supervisor liability can be shown in the following ways:

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong
> after being informed through a report or appeal, (3) creation of a policy or custom that
> sanctioned conduct amounting to a constitutional violation, or allowing such a policy or
> custom to continue, (4) grossly negligent supervision of subordinates who committed a
> violation, or (5) failure to act on information indicating that unconstitutional acts were
> occurring.

*Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (citing *Colon v. Coughlin*, 58 F.3d 865,

873 (2d Cir. 1995)).

### a.    Defendant Ragaglia

Defendants argue that Defendant Ragaglia had no personal involvement in the conduct of

which Plaintiff complains.  Def. Mem. for Summ. J. at 7.  Plaintiff does not respond directly to

this argument.  *See* Pl. Opp. at 29-30 (arguing Fritz and Curran's personal involvement without

addressing Ragaglia).  Elsewhere, Plaintiff alleges that he attended informational meetings where

Ragaglia was a speaker, left phone messages for her, and wrote her a letter once.  For example,

12

he alleges that he called Ragaglia, among others, around August and September of 2000 to complain generally about DCF. Pl. Opp. at 6. He does not indicate the precise time of such calls and does not suggest that he complained about anything unconstitutional or that should reasonably have been construed as such. Nothing therein would relate to the October 9, 2000 incident or its sequel. Although Plaintiff states that he wrote Ragaglia a letter dated October 30, 2000, to request an administrative hearing, which was later scheduled for January 22, 2001, he concedes that she was personally involved in neither the scheduling nor conduct of the hearing. Pl. Opp. at 30-31 ("none of these defendants decided the scheduling of the administrative hearing"). Such contacts do not support a conclusion of sufficient personal involvement by Ragaglia, and summary judgment on the § 1983 claims in Count Three regarding her is **granted**.

### b.    Procedural Due Process Claim--Curran and Fritz

Defendants argue that no Defendant had anything to do with the scheduling, continuance, or conduct of the administrative hearing.[10] Plaintiff concedes this point. Accordingly, summary

---

[10]    Defendants note that "the scheduling of the hearings is handled by the Hearing Officer, who is attached to the Administrative Hearings Unit of the Department of Children and Families. None of the defendants were members of that unit." Def. Mem. in Supp. of Summ. J. at 7. The Hearing Officer is not named as a defendant in this suit. Plaintiff cites no legal authority for his proposition that deferring the administrative hearing pending the resolution of criminal charges violated his constitutional rights. Moreover, Plaintiff provides no explanation why, if indeed he was harmed between February/March, 2001 (when the administrative hearing was stayed) and September, 2001 (when the pending criminal charges were resolved) and continues to be harmed, he has not requested a resumption of the hearing to have his name removed from the registry. Implicitly conceding that a hearing may be postponed until pending criminal charges are resolved, Plaintiff cites *Alfaro Motors Inc. v. Ward*, 814 F.2d 883 (2d Cir. 1987). In that case he notes "there was no due process violation for postponing the administrative hearing because the agency held a hearing after the dismissal of criminal charges against the plaintiff." Pl. Opp. at 32. Plaintiff was notified that if he wished to reactivate his hearing he could do so. Plaintiff has shown no effort to resume the hearing after the criminal charges were dismissed. He does not explain why he did not do so. Saying this was DCF's responsibility is without merit. His belief that DCF should have reactivated the hearing does not excuse his failure to seek his opportunity for its completion. Plaintiff does not establish a violation of his due process rights when its resumption was within his ability. His failure would constitute waiver of his right. Moreover, staying the administrative proceeding while criminal charges are pending prevents Plaintiff from having to potentially compromise his Fifth Amendment right to remain silent or to divulge information in the administrative hearing that may later incriminate him in the criminal proceeding.

13

judgment is **granted** as to Plaintiff's claims in Count Three against Curran and Fritz for violating

his § 1983 Fourteenth Amendment right to procedural due process.

        c.     **Fourth Amendment Search and Seizure Claim—Curran and Fritz**

     Plaintiff alleges violation of his § 1983 right to be free from unreasonable search and

seizure under the Fourth Amendment. Compl. Count Three. He apparently argues that this

occurred when the police arrested him. *See* Def. Mem. in Supp. of Summ. J. at 15 (citing to

Carroll Dep. at 95). No Defendant is shown to have been personally involved in the arrest.

Furthermore, Plaintiff cites no legal authority to support his apparent proposition that DCF

employees violate the Fourth Amendment by being part of an organization that prompted an

individual's arrest.[11, 12] *See* Carroll Dep. at 94. Defendants are **granted** summary judgment on

Count Three regarding Plaintiff's claim that they violated his Fourth Amendment right to be free

from search and seizure.

        2.     **Qualified Immunity**

     Qualified immunity, asserted in response to § 1983 actions, is available only to public

officials who have allegedly violated an individual's federal statutory or constitutional rights.

*See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982);

*Rodriguez v. Phillips*, 66 F.3d 470, 475 (2d Cir. 1995). An individual defendant sued under §

1983 is entitled to qualified immunity if it was objectively reasonable to believe that his conduct

---

[11]    Accordingly, such law is not clearly established and Defendants are entitled to qualified immunity.

[12]    Moreover, the evidence indicates that the officer found probable cause after conducting his own investigation, interviewing the child (in Curran's presence) and Plaintiff (alone). The fact that any of the Defendants set the events in motion by calling the police does mean that they violated Plaintiff's Fourth Amendment rights. The existence of probable cause, and support of Defendants' finding abuse by Plaintiff, is further found in the process by which the Trooper was authorized to arrest him, i.e. the request of a prosecutor for issuance of a warrant and a judge's determination that a warrant was justified.

14

did not violate a clearly established constitutional right. *See, e.g., Anderson v. Creighton*, 483 U.S. 635, 641, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987). Determination of a Defendant's right to qualified immunity is a two-step inquiry. The first step requires the identification of a constitutional right violated by Defendants' conduct. *See Koch v. Brattleboro*, 287 F.3d 162, 165-66 (2d Cir. 2002). If a violation is identified, the inquiry proceeds to a determination of whether the right violated was "clearly established." *See id.* Definition of the right must be sufficiently clear to place a reasonable official on notice that his actions would violate the right. *See id.* Three factors are pertinent to determine whether a constitutional right was clearly established:

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) (citations omitted). Defendants are shielded from liability "as long as [their] actions could reasonably have been thought consistent with the rights [they are] alleged to have violated." *Poe v. Leonard*, 282 F.3d 123 (2d Cir. 2002).

"[I]t is well settled that child protective service members are entitled to qualified immunity for their conduct during the course of abuse investigations." *Wilkinson v. Russell*, 182 F.3d 89, 99 (2d Cir. 1999). The Second Circuit

> has adopted a standard governing case workers which reflects the recognized need for unusual deference in the abuse investigation context. An investigation passes constitutional muster provided simply that case workers have a reasonable basis for their findings of abuse. . . . [C]ourts must be especially sensitive to the pressurized circumstances routinely confronting case workers, circumstances in which decisions between difficult alternatives often need be made on the basis of limited or conflicting information.

*Id.* at 104-05 (internal quotations and citations omitted).

15

Defendants argue that qualified immunity shields them from suit because their actions were reasonable and did not violate any clearly established constitutional right of Plaintiff, regardless of whether or not the child was diagnosed with RAD.[13]

### 1.    Reasonableness of Child Abuse Investigation Process

The deferential qualified immunity standard in child abuse investigations, *see Wilkinson,* 182 F.3d at 104-05, poses a threshold question of whether Defendants had a reasonable basis to suspect abuse (regardless of whether they were ultimately correct or incorrect) and conducted their investigation reasonably.

Plaintiff argues that Fritz's and Curran's actions were not objectively reasonable, "[g]iven the inconsistencies, the reports of abuse, the evidence of retaliation, the quickness of the determination of child abuse, the refusal to learn about [RAD,] and the lack of review or reporting of [the child's] history of previous allegations." Pl. Opp. at 26. He alleges that Curran's "suspect" investigation and quick conclusion that Plaintiff committed child abuse "shocks the conscience." Pl. Opp. at 26. He argues that when Curran called Fritz regarding Plaintiff's background, Fritz cast him in a negative light, did not disclose the child's past false allegations of abuse, and mentioned Plaintiff's complaints about DCF, thereby "taint[ing]" Curran and triggering a "chain reaction." Pl. Opp. at 27, 36.

Defendants contend that the child previously related incidents of corporal punishment found to be true, and that a psychologist who had examined the child before October 9, 2000 testified that in the past the child both reported accurately and lied. Def. Mem. in Supp. of Summ. J. at 8-9. Defendants note that the school nurse and emergency room physicians who

---

[13]    Plaintiff is not accorded *carte blanche* to dictate how to deal with a child afflicted with RAD.

16

examined the child did not believe his injuries were self-inflicted. Def. Mem. in Supp. of Summ. J. at 9; Def. Reply at 5. Defendants point out that although Plaintiff argues that they jumped to conclusions about the child abuse, Curran spoke with "the child, the emergency room physician who examined the child, the school nurse, the school social worker, the school principal, the DCF treatment social worker, a doctor from the child's pediatric group, the child's therapist, and the [P]laintiff and his wife, among others." Def. Reply at 4. Moreover, Plaintiff claimed to be unaware of the child's injuries. Def. Mem. in Supp. of Summ. J. at 10-11.

Plaintiff argues that Defendants retaliated against him, and that "[n]o investigation, no matter how objectively reasonable, gives a government employee license to deliberately retaliate . . . by being untruthful and not forthcoming about material information." Pl. Opp. at 25-26. He argues that "[c]ase workers cannot be free to substantiate a claim of abuse . . . by ignoring overwhelming exculpatory information or by manufacturing false evidence." *Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999). The present case does not involve "overwhelming exculpatory information" and there is no evidence that Defendants "manufactured" the visible injuries on the child or coerced or even misled the school social worker, the school nurse, and the emergency room workers to conclude that the child's injuries were suspicious and not self-inflicted. Like the present case *Wilkinson* involved "conflicting information," and the court "[found] it significant" that the evidence did not "unequivocally" suggest that the children in that case "had been coached rather than abused":

> The transcript of [the child's] interview, for instance, reveals that the child at times claimed that he had been coached by his mother, but at other times maintained that his allegations were true. . . . The evidence thus suggests that the children gave conflicting signals as to whether their father had abused them. . . . . Although [the doctor] determined that such considerations [that the children's allegations were credible] were outweighed by countervailing evidence of coaching and fabrication . . . the fact remains that [the

17

doctor] was able to identify a number of significant considerations providing defendants with a basis to conclude that [the father] was guilty of abuse.

*Id.* at 105. Although there were flaws in the investigation, it was concluded that the defendants "had a reasonable basis for their substantiation determination and that they therefore did not violate plaintiffs' constitutional rights." *Id.* at 106; *see also DeRosa v. Bell*, 24 F.Supp. 2d 252, 262 (D. Conn. 1998) (finding defendants entitled to qualified immunity absent showing of "clearly inappropriate or inadequate investigative techniques").

Given the nature of the child's injuries and the multiple observations of people who observed him, it was not unreasonable to suspect and find child abuse. Plaintiff focuses on the child's diagnosis with RAD and his tendency to lie, but there was evidence that the child had been truthful about abuse in the past. As in *Wilkinson*, here the "conflicting information" did not "unequivocally" suggest that the child was lying about the October 9, 2000 incident. It would be deeply troubling to conclude that an RAD child who had lied in the past could never be believed regarding child abuse, especially when based on observed symptoms multiple people believed the child's injuries were not self-inflicted. Plaintiff argues that Curran's failure to inform the school nurse and emergency room doctors about the child's "history of false abuse allegations" precluded them from making a "credibility determination." Pl. Opp. at 28. He cites no legal authority that, under those circumstances, the child's credibility would be required to be found lacking. "The legislature has expressed the strong public policy of encouraging medical professionals and other persons to report actual and suspected child abuse to the appropriate authorities and agencies." *Zamstein v. Marvasti*, 240 Conn. 549, 559, 692 A.2d 781 (1997). Logically, this policy extends to DCF employees. Regardless of whether or not Curran and Fritz were "angry" with Plaintiff, the investigation and decision to substantiate child abuse was not

18

unreasonable. That decision was supported not only by the child's disclosures, but also by the child's observable injuries independently found to be consistent with the child's account. Defendants' investigation process was not shown to be unreasonable and does not "shock the conscience."

Accordingly, Defendants are **granted** summary judgment on the Count Three § 1983 claim that Defendants' actions "shock[] the conscience."[14]

### 2.    Fourteenth Amendment and Plaintiff's Right to Pursue a Child Care Career

Plaintiff argues that his Fourteenth Amendment right to due process to pursue a child care career was violated because as a result of the child abuse substantiation he has been stigmatized by being placed on a child abuse registry. Compl. Count Three; Pl. Opp. at 21.

Plaintiff's relies on a claimed constitutional right to a child care career. He cites no cases to support this proposition. He further implies that inclusion on the child abuse registry deprives him of a protected liberty interest because the listing not only stigmatizes him but also it denies him employment in the child career field. *See Valmonte v. Bane*, 18 F.3d 992, 999 (2d Cir. 1999). In *Valmonte*, the plaintiff complained about the general statutory scheme regarding a

---

[14]    To the extent Plaintiff argues that any of Defendants' other actions shock the conscience, his claims fail. "The protections of substantive due process are available only against egregious conduct which goes beyond merely offending some fastidious squeamishness or private sentimentalism and can fairly be viewed as so brutal and offensive to human dignity as to shock the conscience." *Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 & n.6 (2d Cir. 1973)). "[M]alicious and sadistic abuses of government power that are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246 (2d Cir. 2001).

In conclusory fashion and without citing caselaw, Plaintiff contends that Defendants' actions shock the conscience because they retaliated against him and quickly decided that he committed child abuse. Pl. Opp. at 24-25. He cites no legal authority to support his claim that Defendants' actions are malicious, extreme, sadistic, or brutal and were intended only to injure him. Moreover, he fails to demonstrate that investigation and substantiation of suspected child abuse does not serve a legitimate government purpose.

19